Thank you, Judge Payes. Good morning, Your Honors, and may it please the Court. I'm Kathleen Sullivan, and I'm arguing this morning on behalf of the petitioners, APAC, Association of Public Agency Customers, who are the real parties in interest in this case because my clients, the industrial customers who buy power from the preference utilities, the so-called COUs, customer-owned utilities, they will be the ones who are really paying the overpayments that come out of the settlement we've signed. We challenge today as approved by the 2012 Rod. Now, we come back today to a problem familiar to this Court because six years ago, in the PGE and Golden West cases, this Court invalidated the approval of a settlement for violation of the procedures set forth in the Northwest Power Act for balancing the interests of the customers of the COUs, my clients, against the interests of the customers of the investors. Now, as this Court made very clear in PGE, this balance is not a matter of the Bonneville Power Administration's discretion. Is it your position that this global mess, if I can use that term, just cannot be settled, period? The only thing that they can do is run the numbers and send out the notices? That is not our position, Judge Trost. We think that there are settlements that are possible as long as they don't violate the express terms of the statute, in particular, Northwest Power Act sections 5C and 7B. For example, this is a 17-year settlement purporting to run the so-called residential exchange benefits out to 2028. Forecasts and scenarios. Forecasts and scenarios. And we're not against forecasts and scenarios. They're part and parcel of the rate-setting process. But, Your Honor, the Bonneville Project Act makes clear that, in Section 5A, that rate-setting is to be done no less frequently than every five years. That's 16 U.S.C. 832-DA. They say, of course, we'll be doing that. Well, they say they'll be setting the rates, but our position is that the rep benefits are inextricably intertwined with rate-making, such that if you're going to settle out rep benefits, you can't do that divorced from the rate-making. So if rate-making needs to be under the statute no more than every five years, you can't have a global rep benefit settlement that forecasts out 17 years. So that's our first position, Your Honor. We would say we're not against settlements. They just have to be settlements that conform to the statute. The second thing — So the settlement couldn't exceed five years, project out five years? We think under the statute the rep benefits can't be projected out separate from rate-making. And I'd like to try to explain why that is. And I wanted to really focus on two aspects of our argument. I know it's a complex argument. Your Honors have reset this. Alcoa is out of the picture. So we can eliminate a lot of the arguments in the responsive briefing. And on behalf of APEC, I really want to focus, Your Honors, on just two points. One is we're owed $611 million in refunds based on your PGE decisions that we have not gotten in the settlement. That's cash on the block that should be in our hands through the COUs. Now, you're going to hear later that the COUs here are sitting at the other table. They signed on to the settlement. But the reason we're here, Your Honors, is that we're the real party in interest. We're the customers of the COUs, and they have pass-through contracts with us. They have cost-based contracts with us that say we, as their industrial customers, have to pay their costs. And that's in the supplemental record that Your Honors granted admission. That's ECF 75 in this docket. It's very clear in Paragraphs 7 and 9 of the Zerngebel Declaration that Georgia Pacific and other members of APEC have cost-based pass-through contracts. Same is true of Paragraph 3 of the Lively Declaration, Lovely Declaration. So we're here because we're owed the refund that would be passed through to us had the COUs properly received them. And the second thing I want to focus Your Honors on is that going forward, the rep benefits have been set just as much in violation of the statute, the Northwest Power Act, as were the settlement rep benefits back in the 2000 settlement that this Court voided. Okay. Let me take the refunds first. And just to finish, Your Honor, we're not saying that there's a rigid rule that there has to be rep benefits every five years. The statute doesn't specify when the rep benefits have to be calculated. We're arguing that a purposive interpretation of 7B2 would say you do rep benefits when you do rate making. Seventeen years is too long. And, Judge Pratt, just to finish the answer to your question, there could be settlements as to the rate, sorry, as to the method or schedule for rep benefit payments. There could be lots of forms of settlement, but not this one. And I like to start with refunds because that's very intuitive. Six years ago, you say, in PG&E and the companion case, that the statute's been violated. Northwest Power Act, President Carter signs it into law in 1980, Congress enacts a careful balance that sets forth very clear procedures, and BPA cannot abrogate those procedures as part of some loosey-goosey balancing settlement authority that it claimed in that case. And what you said so clearly is that the Northwest Power Act was a finely wrought congressional balance between the COU interests and their customers' interests on the one hand and the IOU interests on the other. And that's why procedures matter. And what you did is you said the 2000 settlement gave much too much benefit to the IOUs and their customers to the detriment of the COUs and their customers, my clients, the great industries that built the Northwest based on the cheap hydropower that the New Deal made possible. And so what you said is go back to BPA, and BPA admitted that the COUs were overcharged at least $985 million, almost $1 billion. That's admitted. That's admitted in the record at ER 684. Now, there's a separate set of appeals. You've held them in abeyance. My clients argue that the overcharges might have been much higher, $2.2 billion. We're not here to discuss that. I just want to focus on how the COUs, and by virtue of the pass-through contracts, the COUs' clients, customers, my clients, have not gotten that $985 million back. Now, BPA has refunded $474 million of that amount. What's missing is the $511 million remaining on the principal plus $101 million in interest. ER 273, BPA admits that there's $612 million left to be refunded. Now, you might say, Ms. Sullivan, what are you talking about? We looked at the settlement, and there's a table in the settlement that talks about refund amounts. It's at ER, and you've got a lot of these things really several times. You've got them both in the ER and in the SER. But if I could turn your attention for ease to the ER, the excerpts of records, this is volume 1C of the ER, and there's a table that appears on page 455, and you look at it, and it looks like, gee, what are you talking about? There's a table of refund amounts. Refund amounts, table 3.2 on ER 455, and they total the $612 million. So I want to explain to your honors why it is that that's an ERSAS refund. It's not really a refund coming back to the COUs. It's a quote, unquote refund that the COUs are being made to fund themselves. How do we know that? It's in the text of the settlement. The settlement in 3.3, same page, 455, paragraph 3.3, says that EPA is going to collect both the scheduled amounts, the rep benefits. Rep benefits are the subsidies that IOUs get if their costs exceed EPA costs. It's in a sense a cash rebate or a subsidy to them. Scheduled amounts are rep benefits, but look what else is covered in 3.3, the refund amounts. And how are those distributed? If you look over at 3.3.4, which is over on page 456, and you can look at these at leisure, but I just want to highlight what is done in 3.3 and 3.3.4. What is done there is there's a surcharge procedure that doesn't involve the parties here. It involves the DSIs. They're not here. Once that surcharge procedure is over with, the allocation of remaining costs of rep recovery amounts to applicable rates. That's what 3.3.4 says. Allocation of remaining costs of rep recovery amounts to applicable rates. And I just have to make you do one more step in this statutory, sorry, in this settlement excavation here. What's an applicable rate? Well, if you go back to page 447 of the ER, that's the definition section, you'll see applicable rates are defined as including the rates charged to the COUs from whom we buy power. It's charged to the Tier 1 PF rate. Applicable rates are charged there. But who's excluded? What's expressly excluded on 447 in the definition of applicable rates is applicable rates will not include any reference rate. The reference rate is the basis for the exchange rate. That's the rate that the IOUs are eventually charged by BPA. So in a nutshell, Your Honors, the refund is charged to the COUs, but the refund is not charged to the IOUs. When you said, this Court said in PG&E, PGE, sorry, that the IOUs were overpaid, they're the wrongful beneficiaries of the overcharges. The COUs were wrongly overcharged. They're the ones entitled to the refund. But the refund is not coming from the pocket of the IOUs and going to the COUs. It's coming through an adjustment to applicable rates the COUs are themselves paying. And if there's any doubt about that, if you look at Section 3.3.5, which is also on page ER456, 3.3.5 on page ER456, it makes clear that the COU parties have agreed to pay their allocated share of the scheduled amounts and refund amounts. The very title of that paragraph says the COUs are going to pay their own refund amounts. Now, what are my adversaries going to say about that? They're going to say, well, never mind. The refund, you're actually getting a de facto refund because the RIP benefits the IOUs are getting in the settlement, trust us, they're less than they might have gotten under the statute. The IOUs are settling here for RIP benefits that are less than they might have gotten under the statute. Now, that is not an answer to this argument because now I get to the second part of our argument. The first argument is we're owed refunds. We plainly are owed that money. It's a pecuniary injury. It can be redressed by sending the money that's owed to the COUs back to the COUs. Why do we have standing to argue it? Because there's a pass-through contract. We'll get that money in our own pockets, as we did before. And the first $474 million, the IOUs got lesser RIP benefits, the COUs got a credit, and we got a Res-Ex credit on our electric bill from the COUs. We want it done that way again. We want the cash back. Now I get to the second part, Your Honor, and this is why it's no answer for the settling parties. Right? BPA, the IOUs, the COUs, most of the COUs, 90 percent of them, there's some non-settling COUs. They've all agreed to this. And what's this to the COUs? They get to pass their costs out to us. That's why we're the real parties of interest here, the customers of the COUs. Why is this argument that, oh, the IOUs gave up RIP benefits they might have gotten, wrong? It's wrong, and that brings me to the second argument here. The settlement is contrary to law for the same reasons. The 2000 settlement was contrary to law because it ignores the role of 7b-2 and 7b-3, sections 7b-2 and 7b-3 of the Northwest Power Act. Now, your decision in PGE made clear what 7b-2 and 7b-3 are. Those are the statutory protections for the COUs. They're the statutory protections that said that the preference rates that the COUs have enjoyed since the New Deal. That's how the Northwest was built. New Deal made cheap hydropower available to clients who then brought in the aluminum industries and the timber industries and the other great industries that built the Northwest, electrified rural areas, overcame the problem when J.P. Morgan and the robber barons wouldn't build electricity through their holding companies. The COUs have enjoyed these preference rates since the New Deal. And when the Northwest Power Act comes along in 1980 and says, well, we're going to distribute a little bit of this cheap hydropower also to the IOUs for the benefit of their residential and small farm customers, we're only going to do it on one condition, that it won't harm the preference rates enjoyed by the COUs and, therefore, by their customers. And, by the way, No matter what you do, you may not harm that. That's exactly right, Judge Stroud.  How does this tamper with it? It harms them in the following way. 7B2 and B3 prescribe a process in which the rep benefit to the IOUs is the end product, the output, the residual at the end of the day. The way it works is if you start with 7B1, BPA is supposed to – let's say the IOUs come forward under Section 5C. They say, please exchange power. BPA says, okay, you'd like to exchange your expensive power at your average system cost for our cheaper power at our BPA rate. Well, before we get there, before we figure out whether we're going to do that, we have to figure out what the exchange rate is. The exchange rate is the key variable that determines the difference between the IOUs' expensive power and the BPA power that they're allowed to exchange it for. But the exchange rate has to be generated through a process set forth in 7B2. And just to simplify it greatly, 7B2 says, first, set the exchange rate equal to the preference rate. So, presumptively, IOUs are going to pay the same as the COUs to BPA for the power. But then run it through the so-called 7B2 rate test. And 7B2 says, imagine a hypothetical projected cost based on five assumptions, assuming, Judge Trott, that there is no benefit in the picture, that you're not being harmed by the arrival of these new 1980 constituencies. And if the base rate after you run the test exceeds the outcome of the 7B2 test, then what is BPA supposed to do? It's supposed to reduce a preference rate, which is charged to the COUs, from which my clients buy power. And it's supposed to increase the exchange rate that the IOUs pay to BPA. So, the net benefit is the outcome of an equation in which the variables are the ACS, the costs to the IOUs, minus the exchange rate. But the exchange rate is a variable determined by the 7B2 rate test. What this settlement does, to answer your question, Judge Trott, is it eliminates the 7B2 rate test as a protector of the preference rate. If the 7B2 test is run, the exchange rate is supposed to be increased and the preference rate decreased. Or put another way, the preference rate is decreased and BPA has to allocate to other rates, including CSI rates as well as IOU rates. It has to allocate to other people. In other words, the IOUs have to get less benefits if it's going to hurt us to give them the same rate. Now, why is that missing here? I need to explain this very clearly to you. That process is eliminated by this settlement. It's eliminated because the settlement did things exactly backwards. It did the reverse of the statutory sequence. It started with a fixed lump sum of RET benefits to the IOUs. It's sort of like the Red Queen, execution first, trial second. Let's figure out, let's stipulate to the output RET benefits. And how do we know that? We know that because there was an agreement in principle before the settlement was arrived at. And if you look at SER, page 1309, paragraph 2A, you'll see that the agreement in principle stated that the settlement documents will provide that the IOUs eligible to participate in the ResEx program will receive RET benefits for the, it was then 21-year period, but a period after 2028, equal to $2,050,000,000, $2.05 billion. Guess what? You go to the settlement and that never changed. They started with the end products, $2.05 billion. Where does it show up in the ultimate settlement? It shows up on page ER454 in the schedule in settlement, paragraph 3.1.1, the schedule of RET settlement benefit payments to IOUs. And if you add up the fixed lump sum and all those columns, it doesn't add up to $2.05 billion. It adds up to the net present value of $2.05 billion, discounting for future inflation. But there's no dispute that that $2.05 billion gets set in the agreement in principle, it gets front-loaded into the settlement, and it makes everything else bend to the end result. So now let's see what happens in this topsy-turvy world. We've turned the statute on its head. We started with the RET benefit. The RET benefit is supposed to be the output. You're supposed to take IOUs average system cost, subtract an exchange rate, which has been determined by running the 7B2 test. The exchange rate is going to go up if the 7B2 test says the COUs are going to be harmed by the RET benefit, and that's going to reduce the delta between the ACS, the average system cost, and the exchange rate. And the preference rate is supposed to go down. Well, we're not going to do this under the settlement. Under the settlement, the settlement is a hell or high water guarantee of a fixed lump sum RET benefit, no matter what the 7B2 test would have dictated about the exchange rate. To put it sort of just in simple terms about the equation, the equation is supposed to be ACS minus exchange rate, lowered or raised by the 7B2 test, equals RET benefit. But because it's done backwards, RET benefit is fixed, and what's the BTA going to do? It's going to jerry-rig the exchange rate. The exchange rate is supposed to be the independent variable. RET benefit is supposed to be the dependent variable. The settlement flips it. It makes the RET benefit the independent variable, and it makes the exchange rate the dependent variable. That's backwards. It's backwards. Now, there can't be any dispute that's kind of what I was getting at earlier when I said, don't you have to run the numbers, and isn't that what you're saying? Yes. Now, you do have to run the numbers. Exactly, Judge Trout. The exchange rate numbers will never be run under this settlement contemporaneously with the rate making because everything's been predetermined for 17 years. That's sort of what I was indicating at first. You start out with a huge number, and then you start plugging things in, and you're saying you have to run these numbers, period. Well, yes. What I'm arguing is that BPA must run the 7B2 rate test. It must run a determination of whether the exchange rate at which the IOUs are getting subsidized power. They must run that test. We think contemporaneously with the rate making. We think that's sensible. But you must run it first. I don't care when you do it. You have to run the exchange rate to generate the RET benefit. You can't take a RET benefit out of the air and then jerry-rig backwards what the exchange rate is. Once you run it, what limitations do you have on settling from there? Well, we think that you could absolutely settle, as I said before. If you run the 7B2 test and you want to change rate making to every five years, you could have a five-year settlement. The second thing you could do is you could have a settlement as to the method by which RET benefits will be paid, even if you do it on a two-year basis. The statute says you have to do rate making every five years. The practice has been to do rate making every two years. But our point is that the numbers have to be real numbers that are run in a way that is conjunctive with rate making. Can you read our prior cases as saying that, exactly that? I mean, you started off by saying that, you know, what's wrong here is the errors that we pointed out in our prior two cases. Yes, Judge Paez. I believe that PGE says in hype verba that 7B2 must be followed in sequence, in this sequence. The sequence is IOU comes, it says air costs are too high, please give us BPA power. BPA is then supposed to say, let's figure out your exchange rate. Oh, your exchange rate, I have to, I'm sorry, I have to increase your exchange rate because I've run the 7B2 test and found out that the COUs are going to be hurt. Yes, I believe that absolutely, PGE says that is the right sequence, that RET benefits are the residual at the end of the process in which BPA runs the rate test to determine the exchange rate. What is not decided, Judge Paez, and I concede this, is anything about the timing of the 7B2 test. But I would suggest that there's no need for Chevron deference here on the sequence because the statute is clear on what the sequence is. BPA determines exchange rate first, RET benefit second. Can't start with the RET benefit and then put in a plug number for the exchange rate. And why we have a procedural interest in that here, we're here as the clients of the COUs. We think that we put our faith in Congress with all respect to the BPA and its desire to have an equitable settlement and its desire to spread the benefits of cheap power throughout the Northwest. The Northwest Power Act could not have been more clear that the balance is to be struck by Congress through the statute. And the statute is very clear and unambiguous and specific as to the sequence, exchange rate first, RET benefit second. Can I just ask you, does the BPA have any control over the rates that the utilities set for your customers? Do you have any direct say? No. The BPA sets the rates for our customers and for COUs. For COUs. And the COUs set the rates for us. But I mentioned to you before that in ACF 75, you'll see that the COUs have contracts with us. Remember, we're industrial customers. Right, right. Our rates are not set by the rate commission, as residential customers are. Our rates are set by contract. And in our contract, there's a pass-through, a cost-based pass-through mechanism. So it's really not disputed here that the COUs are going to pass through the BPA's costs to us. So we're ultimately bearing those costs. And that's why we're here. And we think we have a procedural – this is a classic case in which we have a procedural right to be here because we have a concrete economic interest that's affected by adherence to the statute. So, yes, Judge Paz, we think that PGE said you must adhere to 7B2B3. We think the best reading of 7B2 and B3 together is that benefits, which are an integral part of BPA rates to the utilities, should be set at the same time as rate making. That's the logical inference. And I just want to get before I reserve five minutes for rebuttal, if I may, I want to anticipate what the other side is going to say back. They're going to say, what is Ms. Sullivan talking about? We did the 7B2 test. We got our computer programmers and we ran 17 years' worth of 7B2 scenarios. And we built in different assumptions about costs. And we forecast into the future what ACS might be and what BPA costs might be. And so we just shrank 7B2 into this one little mathematical moment of forecasting 17 years out. And I just want to make three points about why that's an inadequate substitute. It's not a real 7B2 test. It's kind of a Potemkin Village 7B2 test, a facade for a 7B2 test. The first is that BPA covered only a limited range of scenarios. They say, oh, well, look, in 23 out of 26 scenarios, you COUs should be grateful because you do better under our settlement than you would under the 7B2 test. Well, there are an infinite number of other scenarios they didn't run that could have produced a different ratio. The second reason is, as I mentioned before, divorce benefits a 17-year projection from rapemaking, which has to be done by statute every five years. And third, it's very speculative over a very long period. So I'll look forward to responding more in reply on rebuttal. But we think that the 17-year ERSOT 7B2 test is no 7B2 test. The settlement should be voided. And I'll respectfully request to reserve the remainder of my time. That's fine. Thank you. Thank you, Your Honor. Good morning. May it please the Court. My name is Kirk Cassad, representing Respondent Bonneville Power Administration. I will use 20 minutes today for my argument. And counsel for respondent interveners will share 10 minutes. If it pleases the Court, I'd like to refer questions on standing to Mr. Waldron, who is the Counsel for the Investor-Owned Utilities. Please forgive my voice. I'm at the end of a very bad cold. If you have any trouble hearing me, please speak up. First, I'd like to review the number of points that opposing counsel made. Let's start with the first point, that the PGE case is the same, virtual same circumstance the Court is facing here. And that is simply false. In the PGE case, there were four different things the Court found that were corrected in the current settlement before the Court. BPA used Section 7G of the Northwest Power Act to allocate the settlement costs, not 7B2. BPA corrected that. BPA used a non-existent ASC methodology in PGE. BPA corrected that. BPA used the existing in effect ASC methodology. Number three, the REP amount, the exchange benefit amount in the PGE case, was $140 million when the amount forecast in the rate case was 48. Here, there's a billion dollars of extra rate protection provided to the preference customers. Finally, actually, those were the three points instead of four. I misspoke earlier. But when we received the PGE decision, we respected it greatly. And as you can tell from the record, we took great pains to ensure that we complied with that decision. How do you respond directly to Ms. Sullivan's argument about the 7B2 test? Which argument in particular, Your Honor? Well, it's just that you're not running it on a regular... We did run the 7B2 test, Your Honor. You projected it out. Yes, we did. 7B2, even for a single rate period, projects out. 7B2 requires projections. Here, you're projecting out 17 years, correct? That's correct. For example, in a five-year rate period, we project five years for the rate period, an additional four years. That's nine years of projections in a normal rate case before BPA. This is just 17. Also, in the 17-year projections, BPA conducted a full-blown... This is no fake or, you know, plastic 7B2 test. This is the real thing. Full use of all the computer models, full use of all the data. We did a 7B2 rate test for each year plus the following four years. For each of those 17 years of the 7, every one. And let me go a little bit further on that, too, Your Honor. BPA first used what it called a reference case. BPA took the best facts it had and the best forecasts it had, and it ran the 7B2 rate test, and it determined what the exchange benefits would be. BPA came up with a number that, as I mentioned before, would provide a billion dollars more in rate protection. That is a billion dollars less in exchange benefits for the IOUs. But BPA didn't stop there. That was the best estimate BPA could possibly make of what's really going to happen. We did that. We didn't stop there. We said, as we acknowledge, any forecast involves risk. So, what did we do? We went back and we added additional scenarios. We added scenarios that assumed the most adverse facts for the amount of benefits that the investment utilities would receive. The lowest average system costs, the highest cost in BPAs at the exchange rate, and many other scenarios on the other side as well. But even under those most adverse scenarios, it turned out that the rate test produced $470 million less in exchange benefits for the IOUs for the settlement than absent the settlement. So, this was a very robust analysis comprised of actually over 472 runs to address all of the risk and other factors. So, we did address 7B2 fully, and I may come back to 7B2 some more, Your Honors. When asked whether or not BPA could have an exchange settlement, opposing counsel finally answered yes for five years. But that's virtually no settlement for purposes of what the customers of BPA need to get the certainty for their costs and for the benefits from the exchange program. Five years is a single rate period. If we can only do it for that, then basically what this court said in the PGE case was that BPA can't have exchange settlements. It is virtually meaningless. And this court did say that in PGE. They said this BPA can have residential exchange settlements, and that's what we worked so hard to develop with all of our customers. Section 5A was signed by opposing counsel, and I think Judge Piazza, it may have been you that pointed out correctly, that governs rates and the settlement doesn't establish rates. So, that does not apply here. There is a point that opposing counsel made regarding not receiving refunds. BPA conducted what was called the WPO7 Supplemental Rate Case, which was its first attempt. Excuse me. First attempt. I'm sorry. There's some water over there. I'll tell you how much is the cold and how much is my throat. Good recommendation, actually. The opposing counsel mentioned that they will not receive the refunds that they desire. The residential exchange settlement basically took many of BPA's decisions from its first attempt to respond to the PGE and Golden Northwest cases and preserve those in the settlement, and one of those was the refunds. And in WPO7, BPA determined that the amount adjusted for inflation now was $1.2 billion. About $500 million of that was paid already, and about $600 to $700 million is still to be paid, and those will be paid in the next seven years. So, they're receiving $1.2 billion worth of refunds under the settlement. And I have a note that's too cryptic for me to note. This is just as wrong as the PGE, but PGE, I don't believe, involved a refund scheme similar to the one that we incorporated into the settlement. Well, the way I heard the argument was that you figured out a very clever way of making them pay the refunds. Oh, there was an argument. Thank you, Your Honor. They had argued that they're paying for the refunds, not the investor-owned utilities. Thank you very much, because that's just not the case. And let me walk the Court through an example that will, I think, clarify this. The question is, whose money is the money that's being used for the refunds? Well, it's the investor-owned utilities' money. Let's take the first year of the settlement, fiscal year 12-13. And in that year, the investor-owned utilities, after 72, would have been entitled to receive $270 million in exchange benefits. The rates would have been set to collect a portion of $270 million, a large portion, for each year of the rate period. Under the settlement, however, the IOUs agreed, instead of getting what they're entitled to, $270 million, they agreed to take only $182 million. That's their money. They're giving up. And that left $88 million in exchange benefits that they gave up, 76 million of which was used for refunds. So, the investor-owned utilities are the ones paying for the refunds. They're not paying. The CLUs are not paying for them. And the CLUs, of course, as was pointed out, no CLU is opposing the settlement. What are we to take away from that? No CLU is opposing the settlement. What does that mean? Well, I grant Your Honor that regardless of how wonderful or unanimous support for an agency action may be, the question is whether the agency action is lawful. But here, this is an extraordinary achievement where the litigation over the last 30 years that's been seen by this court has seen constant fighting between the investor-owned utilities and the consumer-owned utilities, and primarily in this area of the residential exchange program. What this does is it achieves a piece that I did not expect to ever be done that has been worked out by those parties, and then thoroughly reviewed by BPA to ensure that it was consistent with the law. So, I think the issue may go more to the standing issue that Mr. Walden will address, because the CLUs are the only parties that have rights under the Northwest Power Act. Consumers like APEX members and me, other people in this room, we're all in the same boat. We don't have any contract relationship with BPA. We don't pay the rates. We're just downstream consumers. Let me ask you, what would be the consequence if we were to invalidate in any way the settlement? What happens? Well, the settlement is found invalid. We'd be remanded to BPA. BPA would have to conduct a proceeding in which it would determine how best to respond to the court's order, the court's opinion. Doesn't it try to reserve the benefits to the settling parties no matter what we do? There are waiver provisions included in the settlement agreement only for the signing parties that would try to preserve the bargain that they agreed to, yes, Your Honor. How big of a cataclysm would it be for us to do what Judge Paius suggested, send it back? Well, in part it would be if people are already protected to a certain degree by the settlement itself. The people actually that are protected by the settlement itself would be the ones that would be injured, oddly enough, because every single BPA customer, even those that didn't sign the settlement, are going to have lower rates throughout the term of the 17-year settlement, and that's proven in the record. So if the settlement struck down, oddly enough, those that didn't sign the settlement are adversely affected. Excuse me. I was trying to remember your original question. Let me go to another question. The petitioner says that you've really eliminated the 7B2 test by starting out with a figure and then moving backwards into that. You stipulated direct benefits of $2 billion and change, and then you worked into that. That's not the right way to do it. That's the wrong sequence, and it has adverse consequences. Your response to that is what? Well, first, there's not one single way to satisfy Section 7B2. But can you start out with a number and then go from there, or do you have to work the other way around? Well, what's the importance of 7B2? Did you start out with a number? What happened, Your Honor, was that the COUs and the IOUs got together, and there was a mediation. There were negotiations, and their proposal was not developed in a vacuum. We had just had the WPO7 supplemental rate case to respond to the court's PGE decision. We had had a subsequent rate case. We had had 7B2 runs in each of those. We had current ASCs in each of those. With all of that information that they had, they negotiated what they believed was an appropriate amount of benefits for the IOUs and costs to be borne by the COUs. And the thing that really helped ensure the rate protection was the investment utilities said, we're willing to give up a billion dollars of what we would otherwise receive under the normal implementation of the Act of 7B2. We're willing to give that up. And when they give that up, that translates into a billion dollars of rate protection under 7B2. Now, 7B2 does not say when or how often it should be conducted. It's silent. In fact, APAC agrees it's silent. APAC said, here's what APAC said at page 37 of its reply brief. Quote, Congress's silence regarding the number of years for which to run the 7B2 rate test is irrelevant. But it's not irrelevant because the statute is silent. The administrator, in the context of the settlement, had to determine what is the appropriate time to run the 7B2 rate test. And the administrator properly determined that in that settlement context, you have to run it at the very beginning when you're evaluating the settlement for the years of the settlement. Conduct all those 7B2 rate tests. And then it would be redundant to conduct them in the future because they've already been done. How did you choose the scenarios that you used to run the test? Ms. Sullivan said, you know, there are other number of different scenarios that you could have run. Yes, that was an interesting argument, Your Honor. Which has a point, doesn't it? I'd be happy to address it, Your Honor. First, the scenarios themselves were addressed, developed by the technical staff. And the technical staff looked at a broad range of things that should go into these analyses. So first, as I mentioned, we used our reference case. That was the most likely scenario. If we had nothing else, that's what we used. Then we had the scenarios using risk adjustments, high and low on all the costs, and all those adjustments that still provided a half a billion dollars in rate protection. Then we had litigation scenarios that we looked at. And while opposing counsel says that there were scenarios that would have provided more, just to give you an idea of the spectrum, we used one of the, not book, I can't even call this a bookend, one of the, toward the end of the spectrum was an assumption that they won all their issues in their brief, Your Honor. In litigation. And they prevailed on everything. We looked at that. And then we looked at a scenario that went even farther than that and assumed that they prevailed on issues they hadn't even raised in their briefs. So the spectrum was extremely broad. But here's the important point. Here's a really important point. APAC has not come into this court and demonstrated that any of its litigation positions were correct, were the only proper means of interpreting law, or that BPA's interpretations were wrong. They haven't challenged any of BPA's legal interpretations in implementing Section 72. And there are many. Not anywhere. There's nowhere in their brief before this court where they argue that their interpretations in those scenarios are the only right ones, and here's why. None of that is before the court. BPA's analysis that established that there is a billion dollars more in rate protection for preference customers after the summit is uncontested except for the claim that BPA shouldn't use long-term forecasts for a long-term agreement. That's the only argument they're making against that. The other non-analysis-related argument they made was regarding how frequently the test should be conducted. This goes out for quite a number of years in the future. It's based on lots of assumptions and scenarios and forecasts and everything else, and you admit that you get on slippery ice when you start talking about the future. What remedy does anybody have? Should it turn out six years from now, for example, that all the assumptions that you made turned out to be wrong, and that it's upside down, inside out, and somebody's getting hurt? What remedy might they have at that point? They say the settlement's wonderful. In the settlement, there are provisions that address if things went wrong, and there are a number of provisions that do that, Your Honor. For the non-settling parties? Oh, for the non-settling parties, if things went wrong? For the non-settling parties, the settlement agreement itself would not address that instance, I don't believe, Your Honor. They're stuck. So, yes, Your Honor, although, as I mentioned before, the analysis that we did, I know forecasts are perfect, but if one has to do a forecast, and I believe Your Honor approved a 10-year forecast in the MSR case the BPA conducted, but if one has to do a forecast, and we're doing 17 years, the analysis that we've done, uncontested, and those parties have the right to come in here and argue before the court that they are at risk and that this shouldn't be adopted because of that, and they're not here. They're making that argument, Your Honor. But the analysis was so thorough and the foregoing of a billion dollars was so great that the administrator felt that this settlement satisfied Section 7b-2 and satisfied Section 5c as well. Now, I may be running very short or over my time, Your Honor. I don't want to impringe on the time of my colleagues. If there are any other questions the Court has, I'd be happy to address them. If not, I'd like to note that in the Utility Reform Project case, this Court has favored settlements. This Court said that a settlement should not be overturned as a violation of a clear statutory directive. There is no such violation here, Your Honor, and we have complied with the law, and the settlement is not arbitrary or capricious, and I'd like to thank you for your time. By the way, if we reject, deny the petition for review, what happens to all the pending litigation that's pending before our Court? Thank you. Is that a... Yes. Does it go away, or do we have to look at each case individually to see if it's impacted by this? Part of both, Your Honor. Here's what happens. In the pending litigation, we have filed motions to dismiss on the basis of mootness because all of the decisions that are being challenged are from a WPO7 supplemental case. When BPA adopted the settlement, it expressly withdrew, deleted, terminated those earlier decisions. They're gone, and replaced them with the settlement. So we filed a motion to dismiss in those cases because they're moot. Now, the caveat is, in some of those cases, there are challenges to rate-making where the settlement was implemented, and so in that kind of case, there are issues that parties may have raised that weren't related to the exchange and may be totally outside of that. And so if those other rate-making arguments should be heard and resolved by the Court, but those arguments that relate to the residential exchange are gone. Okay. Thank you very much, Your Honors. Thank you for the opportunity for oral argument. I'm Jay Waldron, arguing on behalf of the Investor-Owned Utilities, the State Public Utility Commission, and CUB. The Association of Public Agency Customers are downstream retail customers that purchase some of their power from consumer-owned utilities. None of these retail customers purchase power directly from BPA. Are they not entitled to reap direct benefits from what goes on? No, Your Honor. Not at all. They don't have any statutory right to purchase power from BPA. They don't have any statutory right to rate protection. They don't have any statutory right to refunds for overcharges. What statutory rights do they have? They have plenty of statutory rights. And actually? None. I can be as blunt as that. They're right. There is an independent elected governing body, a commission for each publicly-owned utility, just like there are PUCs for privately-owned utilities. That's an independent body that stands between the APAC members. I quote a line that I like very much, if I may, Your Honor, from Lujan. It's a line that Council for the Retail Customers has also quoted. Depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume to either control or predict. That gets a little bit into redressability. Pardon me? That gets into redressability. Yes, Your Honor. It conflates redressability and causation. Well, but the first thing, I understood, Judge, Trott's question would be more like is there injury here? Is there a legally protected issue here? No, there is not. Your answer to that was no, but do you need a legally ---- Ms. Sullivan was arguing that the pass-through clause, there's a direct impact on these consumers. Right. First of all, factually, there is direct impact on every consumer. All retail rates are set based, as they describe, based on the cost of the power, in this case some of it is BPA, and the overhead of the utility. Your rates, my rates, everyone in this room, everyone in the Pacific Northwest, perhaps everyone in California that buys surplus power, there is no difference between all of the retail customers and these customers. They have entered into a contract with an independent body, an elected independent body that has laws controlling it. Is that what distinguishes these cases, their situation from the DSIs, the direct service? Exactly, Your Honor. When Congress wanted to address statutory protection, it gave the DSIs certain large industrial customers. They became direct customers. They are protected. They have standing. This court addressed that in the MSR case, and in that case, the court said that the DSIs and other utilities that buy directly have standing. Okay. Why can't, you know, the injury in fact, why isn't, you know, it seems like there's a direct economic impact on these particular consumers through their contracts and the pass-through clause. The addressability is another issue. You may have a point there that we don't, that utilities are not in front of us. But, Your Honor, there is nothing to have a legally protected interest. It's legally protected. Does it have to be, you know, let me ask you this. Does it have to be sort of like in the nature of a cause of action? I would agree with that as a characterization. There is nothing in the Northwest Power Act, not one word, that gives them any statutory protection. There's nothing in their affidavits that shows that they're going to get a refund. And in general, they are situated just like you and me in terms of they receive power. They may have done it contractually because they limit their overhead at the other end. But you and I also, whether we're a customer of publicly-owned utility, an investor-owned utility, we pay the cost of BPA power, period. If we were to grant their petition and send this back to the, back to BPA, wouldn't BPA have to address whatever issues we raise so that, in effect, their harm or their alleged harm would naturally, would be redressed just through the process? That because of the contracts, that may be accurate, but so would the other 45 million people in the West. They would have, we would all have the same rights under that argument. We are all paying BPA rates. We're either going to pay more or less from a remand if Bonneville does something differently. And you are simply, I believe, opening the door for 45 million other claims. I can't believe that there's any way to distinguish because we all pay those rates. That's why one of the things I wanted to point out to the Court is none of the cases cited by them will go right to the heart of it. Stand for what your Honor is saying to me. Under the, in the MSR case- I'm just raising a question. No, no, I'm sorry. But in the, I apologize. Arthur, no. I wanted to jump to my cases. No, I understand. Go ahead. The MSR case, the DSIs had statutory protection under the Northwest Power Act. The contract part of that case, they didn't, wasn't, standing wasn't granted. The DSIs are direct customers. The California Energy Commission they cite because it's got the neat phrase consumers of BPA power within the zone of interest protected by statute. But the consumers there are WPAG, publicly owned utilities, and the DSIs. It doesn't support their case. They cite the PG&E case that retail customers have standing when they're serving utilities. Costs are increased. A very nice phrase. The problem with that is in California Power Exchange, there was a California statute that required refunds. It was a statutory refund, which is not present here. Same way with the FERC cases, Your Honor. Those were all Natural Gas Act cases, which I'm sure you've probably gotten stuck with a case or two of them in your career. They all have the public interest besides just and reasonable. And the public interest gives public entities standing. The Bona, the Northwest Power Act did not do that. It's a very carefully convoluted crafted statute. I guess I was a part of it back in the day. But it has competing interests that are spelled out, the DSIs, the investor-owned utilities, the publicly-owned utilities. It doesn't include retail customers. I challenge counsel to show me where it refers to retail customers. Thank you. Look at your challenge right now. Thank you, counsel. Oh, not quite. We have one more. I'm sorry. Good morning, Your Honors. My name is Paul Murphy, and I represent the preference customers or consumer-owned utilities that are parties in this case. And they are the express beneficiaries of the protection provided by Section 72 of the Northwest Power Act. And every one of them, everyone that I represent, has signed the settlement. I'm going to abandon my prepared remarks and address a couple of points that were raised by Ms. Sullivan, in which I believe she was just simply wrong. The first one is the claim that Bonneville ignored 7b-2 and somehow bungled the relationship between 5c and 7b-2. She contended you've got to do 7b-2 first to find out how much benefits can flow through. But what she's ignoring entirely is 5c sets up a method for determining benefits on a utility-by-utility basis, and it's a cap. There's a limit on what the benefits can be. 7b-2 looks at the aggregate amount of benefits, and there's a cap there. There's a limit on how much of these aggregate benefits ultimately can be charged to the public utilities. Now, normally, if everybody's pushing up against the cap, you have to look at it each time, and there's an interrelationship. But here, Bonneville studied the situation very carefully and concluded that because the IOUs had agreed to accept an amount that was significantly below the cap, 7b-2 didn't even enter into the picture from their own analysis. They concluded that under all scenarios, all credible scenarios, that the limits provided by the settlement meant that the rates paid by the public utilities were significantly below the limit set by 7b-2. How many scenarios? The litigation scenarios that Ms. Sullivan talked about, as Mr. Cassad pointed out, they have not attempted to show in this case that any of those, any of the litigation scenarios, were a legally valid interpretation of 7b-2. Bonneville adopted its own interpretation on the substance, and nobody has challenged it here. Those litigation scenarios, because they've not been demonstrated in this case to have any legal merit, are totally irrelevant. So on the interpretation, the uncontested interpretation that Bonneville has made, Bonneville concluded over an extremely wide range of circumstances, the benefits and the resulting rates to my clients would be substantially below the limit set by 7b-2. And that has not been challenged. As to the refunds, that whole discussion of Ms. Sullivan is simply she doesn't understand where the numbers came from. In the agreement in principle that she referred to, the COUs and the IOUs working with Bonneville had come up with a net amount to be payable to the IOUs. This was net in the sense that it took into account both the benefits that they would be entitled to if there weren't any refund obligation and the magnitude of the refund obligation. Now, who had to pay the refunds among the IOUs was something that my clients really didn't care about. We wanted our money back. And as to who got the money, the IOUs didn't care about. They simply wanted to limit what they had to work out. And so we first came up with these net numbers, benefits minus refunds. And then the IOUs went off and negotiated who's going to pay the refunds. And that's covered in Section 6.2 of the settlement agreement. And the COUs went off and negotiated who's going to get the benefits. And that's covered, and I believe it's 3.1, or excuse me, 3.2, allocates the refunds. But there was no question whatsoever that the refunds were coming out of the benefits that the IOUs would otherwise be entitled to absent the settlement. There was a question asked, what happens if the settlement is voided? Well, first, there's no basis for voiding the entire settlement. Significant portions of the settlement, by its own terms, were intended to survive. So the court would have to look at it to say which portions of the settlement are unlawful. But there was one major consequence that would occur. We've been involved in these fights for years and years and years, and they're very complicated. If some small fraction of the COUs go off and want to fight out 7b-2 in future rape cases, that's going to affect our interest in a very big way. Those decisions, if challenged, will establish precedent in this court. We will have to be involved in those fights every single time if you avoid this whole settlement. And there is absolutely no language that can be pointed to to support the proposition that 7b-2 had to be done in each and every case. You'd have to assume that the Congress intended to preclude Bonneville from entering into settlements, even if they protected the substantive intention of 7b-2. 7b-2 wasn't designed, quote, for rape purposes. It was designed to protect the preference customers from certain costs. And the arrangement that we came to does that. I think we're just about out of time. We're over time. Thank you very much. Okay. Thank you, Your Honors. Four very quick points. I'd like to begin with the challenge on spending. And I'd like to point out that the exact place that we are referred to, the customers of the COUs are referred to, is in the House report from the committee that submitted the Northwest Power Act. We cite it in the blue brief beginning at the bottom of page 5 and throughout the brief. And what the House report said in no uncertain terms is that the point of the Northwest Power Act and the meticulous procedures set forth there was to protect the customers of the COUs, the customers of the customer-owned preference utilities. It's said repeatedly in the report and we cite it in our brief. So there's no question that we're in the zone of interest and we were the intended beneficiaries of 7B-2. Judge Pais, you're absolutely right. There can be no doubt about injury in fact here. It's a pecuniary injury. We failed to get our refunds. We failed to get our proper protection through the 7B-2 process. And redressability here, opposing counsel said, well, the floodgates might open to all rate payers. But as Your Honor pointed out, we're in a different situation from other rate payers. We have contractual pass-through, unlike most customers, and so it won't open the floodgates. As to whether there's a precedent. It's somewhat problematic whether BPA could address all of your concerns, right? I'm sorry? It is somewhat. It's not certain that if we were to grant the petition that the result would be to redress every issue that you've raised here. Well, I'm putting aside a lot of issues we've raised here and I'm asking you to focus on refunds, the $612 billion, and the failure to run a proper 7B-2 test. And those can be redressed because a remand to BPA will not be cataclysmic. This Court did it in 2006 without cataclysm. It simply held that the Northwest Power Act puts BPA through the letter of the statute. I heard a lot of arguments today that might be best addressed to Congress. We need certainty. We need more settlement authority. We need to amend 7B-2 and B-3 so that we can have preformed settlement authority. That has to be addressed to Congress. It can't be something that's improvised by BPA. And they could redress on refunds in 7B-2, Your Honor. They could, absolutely. I just want to give you precedence on standing because the argument that there's no standing here is really refuted by two non-circuit cases. One is the In-Rate California Power Exchange Court case cited in our brief, 245S3-1110 at 1124 footnote 14. This is a case in which you held that, of course, the rate payer can sue the state when the state imposes a rule on an intervening utility that is going to pass those rates on to the customers. And you said the same thing in Central Arizona Water District versus EPA, 990S2-110. So there's precedence in the circuit for saying when the rate payers to the intervening agency are hurt by the action of the party hurting the intervening customer, we have standing to sue. So that's on standing. As to redressability, Your Honor, yes, BPA could address our problems. And I'd just like to say two quick things about the refunds. The refunds could be given back to us in just the same way the $474 million were given before. Lower the rep benefit to the IOUs and give a corresponding cash credit to the CIUs. Don't leave it to future possible imaginary rate sacrifice of rep benefits. For one thing, if the refunds are recaptured in future rates, it doesn't do anything for our orphaned members, our members who are not any more buying from the CIUs. They'll never get their refunds. But even as to the rest of us, it doesn't give us the refunds. As to the 72 test, the problem is not just that it projects that the ERSTAT 72 test you've heard about projects 17 years out. The problem is it starts with the rep benefit and works backwards. Well, they say it doesn't really do that, that they just didn't pick a number out of the air, that this was a result of carefully looking at certain things and concluding based on carefully looking at all the numbers and everything else that 72 just wasn't going to be a problem. Well, Your Honor, all the computer models in the world and all the scenarios in the world can't cure the qualitative problem here, which is, as they admitted, they started with a lump sum. Mr. Murphy? They didn't just pick it out of the air. Well, it's not just picked out of the air, but the point is you can't start with the rep benefit and work backwards because it's... I don't think they started with the rep benefit. They're saying, and I'm going to have to go back and look at this again, they're saying this was a number that was arrived at after careful consideration of all the factors. And we put them all into the equation, however you want to call it, and concluded that we're never even going to hit 72, so it's off the table. Why engage in a process that isn't going to do anything when we've looked at the process and we've realized this chemotherapy won't work? Your Honor, may I answer the question even though I'm past my time? Go ahead. First of all, they did not dispute that the rep benefit number was arrived at prior to running the 72 test. They run the 17-year scenario as a control on a number that they did pick. And I didn't say it was out of the air. They might have reached it through a process of compromise, but it cut us out of the picture. The customers of the COUs were out of the picture. And, Your Honor, the reason why simply sending – if you send this back to BPA, that is the only way to make sure that the customers of the COUs' interests are protected. The settling parties have no power to waive the rights of the customers, and we do have standing here. And it's also been argued that it's uncontested that their assumptions were right in deciding that the 7B2 test was met, Your Honor. And that's not true. Over in the case you're holding in abeyance, the one that comes out of the 07S docket, we vigorously contest the assumptions and we vigorously contest whether the refund amount is correct and we vigorously contest whether the REP benefits were calculated based on properly – proper assumptions. So, Your Honor, with respect, they can't just run a control based on imaginary numbers. And Judge Trott, last point, the reason why you should vacate above all is that this projection is contrary to law, but it shouldn't be excused as just a convenient matter of policy precisely because the world may change. And we may be stuck with it if – non-settling parties may be stuck with the results if fracking alters the universe and natural gas prices alter the universe. I was in America this morning. I said, look, some great new invention comes in and wipes all of this out, some hydrogen conversion, fracking, who knows what. Or a meteor lands in the Northwest. Many things could change to change all these assumptions. But this fixed – Might agree to do something with the sequestration. Who knows? America. Exactly. So, Your Honor, our key point here is that there is nothing cataclysmic about vacating and remanding and saying to BPA, we really meant it in PGE. You have to follow the law the way it's laid out. And the way it's laid out is you run the 7B2 test in order to generate the RET benefit. 7B2 is prior to 7B3. The statute is clear. You run the test and then you say what the RET benefit could be. And nothing the other side said suggested that that number, the 2 billion and change, they said it came through a careful process. It wasn't plucked out of the air. That's fine. It was picked before they ran the IRSAS test. So, with respect, we think you should vacate the petition in its entirety. If you don't do that, then at a minimum, we respectfully request that you send the refund issue back so that we can get refunds in cash rather than through imaginary savings and future RET benefits. Hold on a second. Can we do that? Can we carve that out? Well, you – we think you could carve it out, but we think you – well, let me back up. I think it's – there's no severability provision that would expressly allow you to do that in the settlement. I agree with that. And, actually, we would argue that they're inseverably intertwined. That, in fact, because the other side has said, oh, you're getting your refunds, you're just getting them in the form of the IOUs have given up imaginary RET benefits. Because they're intertwined and because we think the RET benefits can't stand under the statute, we actually think that you have to invalidate – vacate the rod in its entirety to get at the refund. Okay. All right? Thank you, Your Honors. Thank you very much. We appreciate your arguments, and we'll be – we'll adjourn for today.
judges: Alarcon, Trott, Paez